# CIRCUIT COURT OF BALTIMORE CITY

Filed May 31, 1893.

THE BALTIMORE CITY PASSENGER RAILWAY COMPANY

VS.

FERDINAND C. LATROBE, MAYOR, ETC.

*Bernard Carter* and *Arthur W. Machen* for plaintiff.

*Wm. S. Bryan, Jr.,* and *Henry O. Thompson* for defendants.

OPINION.

DENNIS, J.—

This bill is filed by the Baltimore City Passenger Railway Company of Baltimore City to restrain the Mayor, and police force, acting under his authority, from interfering to prevent its erecting upon Baltimore street, the proper and necessary poles for stringing the wires which are required to enable it to adopt what is commonly known as the trolley system, as a means for the propulsion of its cars upon that street. It alleges that the Mayor has refused to allow it to erect these poles, although the City Commissioner has approved of their location, and has instructed the police authorities to prevent any attempt on the part of the company to carry out their proposed action. The bill has been demurred to by the solicitors for the city, thus admitting the facts; the only question is as to the proper construction to be given to two acts of the Legislature which relate to the matter,

The Legislature, Chap. 271, of the Acts of 1890, amended the charter of the Baltimore City Passenger Railway Company, by authorizing and empowering it "to use upon *any or all* of its railway tracks in the City of Baltimore (one of its tracks being laid upon Baltimore street under the provisions of its original charter passed in 1859), and upon any of the suburban railways of the said company, and cable system or other system of propulsion by means of stationary engines, any pneumatic motors, stored electricity motors, and any motor power or means of traction *which the Mayor and City Council may sanction, or which shall be authorized to be made use of in the city of Baltimore by any other corporation exercising street railway franchises therein.*"

Since the passage of this Act several street railways in this city have been authorized to use, and are now using, a system of propulsion by electricity known as the Trolley system.

and by the Act of 1892, Ch. 210, the Baltimore Traction Company was expressly authorized to use this system.

Construing the provisions of Ch. 271 of the Acts of 1890, in the light of these facts and of this act of 1892 alone, it is perfectly plain, therefore, that the Baltimore City Passenger Railway Company is by the broad and express terms of the grant fully authorized to use this Trolley system "upon any or all of its tracks"; the contingency upon which it was to be allowed to exercise the right having thus repeatedly occurred.

But at the same session at which the Act authorizing the plaintiff to use this system of propulsion was passed, another Act, being Ch. 370 (Acts of 1890) was passed, by which it was enacted that "the Mayor and City Council of Baltimore shall have power to *regulate the use of the streets*, lanes and alleys in said city by railway or other tracks, gas or other pipes, telegraph, telephone, electric-light or other wires and poles in, under, over or upon the same, and may require all such wires to be placed underground, after such reasonable notice as it may prescribe." This act was passed later in the session than the other act, but both were signed and went into effect the same day.

Under the authority of this last act an ordinance was passed by the Mayor and City Council on the 25th of November, 1892, which forbids anyone to erect "any hitching posts, telegraph, telephone, electric light or other pole or poles of any description whatsoever, without first having obtained a written permit therefor from the City Commissioner, a p p r o v e d by the Mayor."

It is by virtue of the provisions of this ordinance that the Mayor claims the right to forbid the exercise by the plaintiff of the right expressly conferred upon it by Chapter 271, of the Acts of 1890, to erect the poles necessary for its adoption of the trolley system upon Baltimore street. The claim is that the right to regulate the use of the streets given the Mayor and City Council carried with it the right

to prohibit any use which they did not approve, although such use may have been authorized by the Legislature itself.

The question therefore, thus presented is, did the Legislature, by the passage of Chapter 370 intend to give the Mayor and City Council power to defeat and nullify its own previous express grant of a perfectly well defined right; in other words, was it intended that Chapter 370 should be a repeal of Chapter 271, if the Mayor and City Council should choose so to enact?

It is a fundamental rule in the construction of statutes bearing upon the same subject matter that that interpretation shall be given them which will enable each, and every part of each, to stand and be effectual, if it can be done without doing violence to the language; or, put in other words, the Legislature will not be presumed to have intended to repeal a prior statute by a later one, where both can be so construed, giving a fair interpretation to the language used, that full effect can be given to each.

Where this is not possible—i. e. when the acts are so inconsistent that it is impossible to give full effect to each, then the later statute will prevail, the presumption being that the Legislature intended by this later expression of its will, to repeal by implication, the former, in all points as to which they may be in conflict.

Applying this principle to the case before us, I can see no such inconsistency between the two acts referred to, as to justify holding that Chapter 370, which gave the Mayor and City Council the right "to regulate the use" of the streets, was intended to repeal, *pro tanto*, Chapter 271, under which the plaintiff is authorized to use the trolley system upon its several lines.

It is true that, under some circumstances, the right to regulate the use may carry with it the right to prohibit a certain use; but that is not the necessary, or even ordinary, meaning of that language, and it seems to me clear that the Legislature could not have intended it to have that

meaning, when the result would have been to defeat their own express grant. The Legislature itself, in this case, having directed what kind of use should be made of the street, it only gave the Mayor and City Council, by its subsequent act, the right to *regulate that use;* i. e., to make such reasonable provisions in regard to the manner of exercise of the use as would serve to promote or be necessary to the safety and convenience of the public, but it was not intended they should have the power to destroy the substantial efficiency of the grant. This right of regulation on the part of the Mayor and City Council would embrace such matters as the rate of speed at which the cars should run, the size and character of the poles to be erected and the location of them, the right to require the cars to be provided with fenders and other appliances for the safety of foot passengers, as well as their own passengers, and similar provisions relating to the manner in which the power given by the Legislature shall be exercised.

That this, which is the natural and ordinary meaning of the word to "regulate" was the meaning which the Legislature intended to affix to it in this statute, seems to me to be also very strongly enforced by a consideration of the peculiar language used in Ch. 271.

By the first section of that act, the plaintiff is authorized to use any means of traction *"which the Mayor and City Council may sanction, or which shall be made use of in the City of Baltimore by any other corporation exercising street railway franchises therein."*

By the terms of this provision, it is apparent that the Legislature intended that this company should not be dependent upon the Mayor and City Council for the kind of traction it should use on its lines.

It might apply to the municipal government for its sanction of the proposed kind of traction, but it was not bound to do so; if it applied and the municipal government declined to permit a certain kind of traction, or if the company did not choose to apply to the municipal government for authority to use it, the company was still given the right to use, upon any or all of its streets, *any* kind of traction which any other passenger railway company enjoyed, no matter whether such right was derived from its original charter or by subsequent grant of the Legislature, or by permission of the Mayor and City Council. In other words, it was the clear intent of this act to make this company entirely independent of any action of the municipal government, so far at least as concerned the kind of traction it might desire to adopt on its lines. The right to use particular kind of traction was given by the sovereign power itself, upon conditions which have been fulfilled; the manner and regulation of that use was by it committed to the municipal government.

The construction contended for by the city would make the Legislature to have intended, while taking pains to give to the company the right to use the trolley system entirely independently of the will of the municipal government, and even against its will, almost immediately afterwards to have authorized the municipal government to substitute its will for that of the sovereign power itself, and enabled it to defeat the latter's own express grant. Surely such a construction, involving on the part of the Legislature inconsistency almost amounting to stultification, ought not to be adopted, when, by giving to the language of the latter act, its natural and usual signification, no such inconsistency will result, and full effect can be given to the several provisions of each statute without conflict.

It may be further observed that if the contention of the city is sound, then the Mayor and City Council have as full right to prohibit the use of the trolley system or cable system by this company upon any of its lines, or either of those systems now in use by other companies upon any of their lines, and to compel them all to go back to horsecars, as they have to prohibit the use of the trolley system by this company on Baltimore street—a conclusion which shows the extravagence of the construction contended for, and furnishes a strong argument *ab convenienti* against its adoption.